IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 15–cv–00491–KMT

JAYSON M. OSLUND,

    Plaintiff,

v.

C/O MULLEN, in his official and individual capacity,

    Defendant.

---

**ORDER FOR A NEW TRIAL**

---

This matter is before the court *sua sponte* pursuant to Fed. R. Civ. P. 59(d). As of the date of this Order, Defendant has not filed a motion for new trial as is permitted by Fed. R. Civ. P. 59, although the time within which he may do so has not yet expired. Rule 59(d) authorizes a trial court to order a new trial on its own initiative for any reason for which it might have granted a new trial on motion of a party, but limits this authority by requiring such action be taken within twenty-eight days after entry of judgment. The original judgment in this case [Doc. No. 120] was entered on March 9, 2018. Hence, under Rule 59(d), this court's Order for a New Trial is authorized by the Rule.[1] *Kain v. Winslow Mfg., Inc.*, 736 F.2d 606, 608 (10th Cir. 1984);

---

[1] It is unnecessary for the court to analyze whether the amended judgment [Doc. No. 121] entered on March 22, 2018 started a new time calculation, since this order is entered within the time required from the entry of the original judgment.

*Kanatser v. Chrysler Corp.,* 199 F.2d 610 (10th Cir. 1952). The court finds further that it is not required to provide notice and an opportunity to be heard to the parties prior to entry of this Order for a New Trial because there is no pending Rule 59 motion and therefore this Order is not based upon "a reason not stated in the motion." *See* Fed. R. Civ. P. 59(d).

"A district court has broad discretion in deciding whether to grant [ ] a new trial." *Harvey By & Through Harvey v. Gen. Motors Corp.,* 873 F.2d 1343, 1346 (10th Cir. 1989). A federal court may set aside a jury verdict if the ends of justice require it. *Holmes v. Wack,* 464 F.2d 86, 88–89 (10th Cir. 1972).

Seventy-eight years ago, the Supreme Court of the United States determined that

> [t]he motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . .

*Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940). Although motions for a new trial are generally committed to a court's discretion, they are disfavored and should be granted with "great caution." *Richins v. Deere and Co.,* 231 F.R.D. 623, 625 (D.N.M. 2004); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 749 F. Supp. 2d 1235, 1256 (D.N.M. 2010).

A jury's determination of damages is considered inviolate unless an award is so excessive as to shock the judicial conscience and raises an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981); *Xiong v. Knight Transportation, Inc.*, 77 F. Supp. 3d 1016, 1020–21 (D. Colo. 2014), *aff'd sub nom. Pahoua Xiong v. Knight Transportation, Inc.*, 658 F. App'x 884 (10th Cir. 2016). *See also Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1256 (D. Colo. 2009). A verdict will not be set

aside on this basis, however, unless it is so plainly excessive as to suggest that it was the product of such passion or prejudice on the part of the jury. *Id.* Such bias, prejudice or passion can be inferred from excessiveness. *Malandris,* 703 F.2d at 1168. *See also Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1262 (10th Cir. 1995); *Wells v. Colo. College,* 478 F.2d 158, 162 (10th Cir. 1973). Focus should be on "whether the compensatory award was excessive in relation to the injury[.]" *McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 723 (10th Cir. 2011) (quoting *Malandris,* 703 F.2d at 1169; *Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1150 (D. Kan. 2017)). Cases analyzing the grant of a new trial where damages shock the conscience with their excess recognize the principle that if the court determines that the verdict was the result of passion or prejudice, or for any other reason it appears that the jury erred or abused its discretion on not only on the issue of damages but also on the issue of liability, the court ***must*** unconditionally order a new trial and cannot give the plaintiff the option to accept a lesser amount.[2] *Malandris*, 703 F.2d at 1168 (emphasis added). *See also Minneapolis St. Paul and Sault Ste. Marie Ry. Co. v. Moquin,* 283 U.S. 520, 521–22 (1931) ("In actions under the federal statute no verdict can be permitted to stand which is found to be in any degree the result

---

[2] Where the court concludes there was error only in an excessive damage award, but not one also tainting the finding of liability, the court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy. *See Holmes*, 464 F.2d at 89 and n.3; *Minker v. St. Louis-S.F. Ry. Co.,* 574 F.2d 1056, 1060 (10th Cir. 1978) (discussing the claim of an excessive verdict but stating that the appellate court was not "inclined to order a remittitur" in that case). *And see Kresse v. Bennett,* 379 P.2d 807, 808 (Colo. 1963) (conditional remittitur of a portion of exemplary damages). The court here declines to consider remittitur because a five million dollar compensatory damages award in a case where no injuries whatsoever were proven to have been incurred as a result of Defendant's actions and the evidence of liability was decidedly thin, and as such the court is convinced that its duty is to require a new trial. *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 65–66 (1966).

of appeals to passion and prejudice."); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 160 (1967) ("a verdict based on jury prejudice cannot be sustained even when punitive damages are warranted"). If the court finds that an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, "then the court must order a new trial on all issues because it is impossible to determine the degree to which these factors affected the jury generally and therefore influenced the determination of liability." *Cook v. Rockwell Int'l Corp.*, 564 F. Supp. 2d 1189, 1201 (D. Colo. 2008), *rev'd on other grounds*, 618 F.3d 1127 (10th Cir. 2010). *See also Higgs v. Dist. Ct.,* 713 P.2d 840, 860–61 (Colo. 1985); *Malandris,* 703 F.2d at 1168; *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1560 (10th Cir. 1991).

In this case, the jury awarded the Plaintiff compensatory damages of $5,000,000.00 on a record supporting, at best, only nominal damages. Additionally, the jury awarded $1,000,000.00 in punitive damages on a record which was bereft of any evidence of wrongdoing except that based solely on the testimony of an agitated convicted felon who had known the Plaintiff for only one week, who knew nothing about Plaintiff's seizure disorder nor his use of Coumadin, a blood thinner causing excessive bleeding of any skin laceration, nor the Plaintiff's physical condition at the time his second seizure commenced.

A brief synopsis of the core evidence is as follows:[3]

In the late morning on March 7, 2013, the Plaintiff, Jayson Oslund, suffered a seizure during which he fell backward from a full standing position and landed on his head on the cement floor of the Sterling Correctional Facility ("SCF"). Fellow inmate Ernest Montoya, who

---

[3] Testimony in quotes in this Order is taken from the court's own notes and from the bridge notes of the court reporter and therefore may vary to some extent from the official transcript of the proceedings.

was with Plaintiff at the time, testified that Mr. Oslund "just fell out and then busted his head on the cement." Plaintiff was taken to the medical unit where he was examined, his bleeding was stopped and his scalp wound stitched. Dr. Maurice Fauvel, a staff physician at SCF, testified that when he first saw the Plaintiff that day, Mr. Oslund had a laceration on his head consistent with falling backward onto concrete. Dr. Fauvel testified that the Plaintiff knew he had a seizure disorder but Plaintiff refused to take medications which had been prescribed for him to control his seizures. After this seizure, Dr. Fauvel administered anti-seizure medication; however, he explained that such medications are not instantly effective, but rather have to build up in the system of the patient. Dr. Fauvel noted that Plaintiff had a hematoma on his head from swelling and bruising that the doctor found to be predictable because of Plaintiff's use of blood thinners to manage a clotting disorder.[4]

The activities which spawned this case arose five to six hours subsequent to Plaintiff's injury-causing seizure and fall, after Plaintiff left the medical unit in a wheelchair and was transported to his new ground floor cell.

Inmate Charles Garlick, Plaintiff's cellmate of one week, testified that earlier in the day, before either of Mr. Oslund's seizures, Mr. Oslund had been feeling ill and had left early from his job in the kitchen. Mr. Garlick described Plaintiff as a large man who weighed over 200 pounds. At some point one of the guards told Mr. Garlick that Plaintiff had suffered a seizure and had hit his head on the concrete and was "in medical." When Mr. Garlick next saw Plaintiff, Mr. Oslund was in a wheelchair with gauze bandaging around his head, and he appeared groggy and disoriented. Mr. Garlick was tasked with moving his and Plaintiff's belongings from the

---

[4] Mr. Oslund testified that he had clots before this incident and that he took Coumadin to prevent further life threatening clotting.

upper tier cell where they had been housed, to a cell on the ground floor to accommodate Mr. Oslund's need to use a wheelchair.  Eventually Plaintiff was assisted out of the wheelchair and was placed in a sitting position on a metal locker box which was located in the center of the new cell.  Mr. Garlick was busy with the moving, but when he next looked at Plaintiff, Mr. Oslund was undergoing another "full blown seizure."  Mr. Garlick testified, "it looked like he was trying to hit his head on either the toilet or the corner of the box."

About that same time, Mr. Montoya, who was unable to see Mr. Oslund's cell located one tier below him, testified that he heard a "large crash such as him [Oslund] falling over or something."  Mr. Garlick testified that when he saw Plaintiff banging his body and head around in the cell, he came up behind Mr. Oslund and tried to hold him so that Mr. Oslund's thrashing would be against Garlick's body and not the hard surfaces in the cell.  Mr. Garlick, who did not know about Plaintiff's use of blood thinners, was distressed about the amount of blood coming from Mr. Garlick as he thrashed against his body.  Mr. Garlick testified that he was covered in Plaintiff's blood.  Mr. Garlick started calling for help, leaving Mr. Oslund alone and flailing within the cramped confines of the cell while Mr. Garlick left the cell to get help.  Several officers almost immediately responded.  Mr. Garlick testified that Defendant Officer Mullen came into the cell, took Mr. Oslund from Mr. Garlick and then "hits him against the wall.  He slides down the wall, hits the floor and then he [Officer Mullen] straddles him [Plaintiff] and tells him to stop resisting, stop fighting."  Mr. Garlick said that blood was oozing through Plaintiff's gauze bandage and that there was blood on the wall from the bandage and that it smeared as Plaintiff was taken down to the ground by Mr. Mullen.  Mr. Garlick and Mr. Montoya testified that after Mr. Oslund had been taken to the medical unit, they saw quite a lot

of blood in the cell. Both Mr. Garlick and Mr. Montoya were distressed by orders given to them to clean up the blood from the cell. Mr. Garlick, however, was the only inmate who actually witnessed Plaintiff's seizure and the responses of the various corrections officers because the other inmates were locked in their cells awaiting completion of the 4:00 p.m. "count."

All the officers who responded during Plaintiff's second seizure, had known from shift briefing that Plaintiff had suffered a seizure that morning and that he had sustained injuries during that seizure. Testimony from all the other eye witnesses was that two correctional officers, Officer Mullen and Officer Cynthia Cook, came into the cell with Mr. Oslund and Mr. Garlick and that both officers were physically close to Mr. Oslund and were keeping Mr. Oslund on the floor on his side/back to try to keep him from either falling or otherwise injuring himself. Further, Officers Cook and Mullen were speaking to Mr. Oslund trying to calm him until medical personnel could arrive.

Officer Cook, who was the first officer who came into the cell after Mr. Garlick's call for help, testified that she and Mr. Garlick "got him [Oslund] off the locker box and put him— placed him on to the floor so he wouldn't fall off the locker box." Officer Cook said that directly after that Officer Mullen entered the cell.

Officer Nathan Teter testified that when he responded to Mr. Garlick's call, he saw Mr. Oslund sitting in the cell, hitting his head against the wall. He observed Officer Mullen enter the cell, "put his arms underneath him [Oslund] and moved him away from the wall so he would stop hitting his head. And that was pretty much it. From that point on I think that the first responders handled the rest."

7

Defendant Officer Mullen testified that Plaintiff was sitting on the floor when he first arrived at the cell and that he was clearly in the throes of a seizure, flailing his arms and legs very close to Officer Cook, who was trying to calm and protect Mr. Oslund. Inmate Garlick, who was distressed about all the blood coming from his seizing cellmate, was also in the cell. When Officer Mullen came to the cell door he was confronted with a female officer squeezed into the cell with one very large seizing and thrashing inmate and another screaming and upset inmate.[5] Officer Mullen testified that he grasped Mr. Oslund under his armpits from the back and slid him on his buttocks toward the front of the cell so that he could get him away from Officer Cook and Mr. Garlick and into a clearer space on the floor where he could lay fully down. Officer Mullen said that he then laid Mr. Oslund on his side/back and kept him there until medical help arrived.

Dr. Fauvel again saw the Plaintiff when he was brought back to the medical unit after the second seizure. Dr. Fauvel noted when he saw Plaintiff after the second seizure that some blood had oozed through the original bandage, but that all the sutures previously placed after the first seizure were totally intact and Plaintiff was merely groggy as would be expected from any person recovering from a seizure. Dr. Fauvel testified that the larger amount of blood that was coming from Plaintiff's scalp wound was due to the Coumadin Plaintiff had in his system, rather than any new significant trauma. Dr. Fauvel testified that the Plaintiff had no wounds or bruises or spots or any other damage or injury visible on his body which Dr. Fauvel had not already observed earlier when Plaintiff left the medical unit after his first seizure. Upon his recovery

---

[5] Although the jury was not told exactly what Mr. Oslund's or Mr. Garlick's crimes of conviction were, the jury was aware, based on Dr. Fauvel's testimony, that Oslund and Garlick were housed in the unit reserved for the people convicted of the most serious crimes.

from the second seizure, Plaintiff was placed in observation overnight. By that time, the seizure medications Dr. Fauvel had given him after the first seizure appeared to be working.

A CAT scan and an MRI were ultimately administered to Plaintiff at different intervals over the next several months, and although Plaintiff complained of vertigo, there appeared to be no neurological reason for him to remain in a wheelchair. Although Mr. Oslund engaged with Dr. Fauvel in physical therapy and other remedial medical procedures up through 2015, Plaintiff remains in a wheelchair and claims he cannot transport himself without one. Mr. Oslund testified that he can feel and move his arms and legs and has no paralysis, only vertigo and weakness after all this time in a wheelchair. Dr. Fauvel followed Plaintiff's progress up until 2015 when he left the employ of SCF.

The evidence was uncontroverted that Mr. Oslund suffered injury which left him in a wheelchair and with a bleeding scalp wound after his first seizure where he fell on his head onto a cement floor. Defendant Mr. Mullen was not even in the correctional facility when Mr. Oslund inadvertently injured himself during his first seizure. The evidence was uncontroverted that from the time Mr. Oslund fell on his head into the concrete floor as a result of his first seizure, he used a wheelchair and never was fully mobile again, although there appears to be no medical explanation for this incapacity. There was **no evidence** from any source of any injury whatsoever sustained by Mr. Oslund during and following his second seizure. Regardless of what Officer Mullen did or did not do during the few minutes while Mr. Oslund was having a seizure and before medical help arrived, the evidence at trial was that Mr. Oslund was not physically injured by any action of Defendant Mullen.

9

Nonetheless, the jury awarded Mr. Oslund $5,000,000.00 in ***compensatory*** damages against Mr. Mullen, individually—the only defendant in the case. Although there was evidence concerning negative treatment of Mr. Garlick by prison officials (not including Defendant Mullen) after Mr. Garlick vociferously protested the actions of Officer Mullen during Mr. Oslund's seizure in the cell, as well as notable memory deficiencies of the testifying correctional officers who had apparently not bothered to read their five-year old reports prior to rendering testimony—both of which could have adversely affected the credibility determinations about witnesses by the jury—no reasonable jury could have found that Officer Mullen caused any physical injury to Plaintiff, much less a $5,000,000.00 injury, on the evidence presented at trial. A jury is certainly allowed to take into account "all the decencies of human emotion" when called upon to decide a case; however, it is their duty "not to allow emotion to overcome fact, not to allow sympathy to overcome reason, not to allow desire for result to overcome justice." *Malandris*, 703 F.2d at 1168–69. The jury returned this extremely excessive and unwarranted damage verdict in spite of being instructed about and presented with a verdict form containing an option to find liability against Defendant Mullen for his actions if they felt it was warranted and awarding nominal damages, which, in turn, would have allowed for a punitive damages award. Clearly instead, the jury allowed improper emotion to overcome reason and justice in this case.

The return of such an excessive compensatory damages award shocks the conscience of this court and clearly raises in this court the irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial. Therefore the only choice allowed this court is to order a new trial. To fail to do so would result in manifest injustice.

Therefore, it is

**ORDERED** that

1. The verdict of the jury [Doc. No. 118] is **SET ASIDE**;

2. The Judgment [Doc. No. 120] and the Amended Judgment [Doc. No. 121] are **VACATED**;

3. This case is re-opened, and a new trial shall be held;

4. A four day trial to jury will commence on **July 23, 2018 at 9:00 a.m.** in Courtroom 100, 212 North Wahsatch, Colorado Springs, Colorado 80903;

5. A pretrial conference is scheduled for **June 25, 2018 at 9:30 a.m.**;

6. The Bill of Costs [Doc. No. 122] is **denied as moot**; and

7. Plaintiff Motion for Attorney's Fees and Costs [Doc. No. 123] is **denied as moot**.

Dated this 2nd day of April 2018.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge